UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PFIZER, INC. SECURITIES LITIGATION,

06 Civ. 14199 (LAK)

This Document Relates to:          All Cases

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

Samuel P. Sporn
Joel P. Laitman
Christopher Lometti
Jay P. Saltzman
Kurt Hunciker
Frank R. Schirripa
Daniel B. Rehns
SCHOENGOLD SPORN LAITMAN & LOMETTI, P.C.
*Lead Counsel for Plaintiffs*

Dennis J. Block
Gregory A. Markel
Martin L. Seidel
Mollie E. O'Rourke
CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge*.

On December 2, 2006, Pfizer, Inc. ("Pfizer") announced that it was halting clinical

trials of the developmental drug torcetrapib.[1]  By the close of the next trading day, the price of Pfizer

---

[1]      Amended Class Action Complaint ("Cpt.") ¶ 17.

common stock had declined by 10.62 percent.[2]  Plaintiffs then brought a class action against Pfizer and three of its current and former officers and directors (collectively, the "Individual Defendants").[3]  Plaintiffs seek recovery against defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")[4] and Rule 10b-5 thereunder.[5]  They assert an additional claim against the Individual Defendants under Section 20(a) of the Exchange Act.[6]  The case is before the Court on defendants' motion to dismiss.

*Facts*

The lead plaintiff in this action is the Uniformed Sanitationmen's Association Compensation Accrual Fund.  It purports to represent a class of all individuals and entities who purchased Pfizer securities between January 19, 2005, and December 2, 2006, (the "Class Period").  Pfizer is a Delaware corporation that develops, manufactures, and markets prescription medicines and consumer healthcare products.[7]

---

[2]  Cpt. ¶¶ 17, 153.

[3]  The Individual Defendants are: (1) Henry A. McKinnell, former chairman of the board of directors, and former chief executive officer; (2) John LaMattina, president of Pfizer global research and development; and (3) Joseph Feczko, chief medical officer.

[4]  15 U.S.C. § 78j(b).

[5]  17 C.F.R. § 240.10b-5.

[6]  15 U.S.C. § 78t(a).

[7]  Cpt. ¶ 25.

During the class period, Pfizer was developing torcetrapib, a drug intended to reduce coronary heart disease ("CHD") by raising so-called "good" cholesterol.

In colloquial terms, there are two varieties of cholesterol: "good" and "bad" cholesterol. Whether cholesterol is good or bad is defined by the type of lipoprotein to which the cholesterol is attached. Low density lipoproteins ("LDLs") carry cholesterol into arteries, where excess cholesterol often is deposited as plaque on arterial walls. The deposition of plaque – a process known as atherogenesis[8] – narrows arteries and restricts the flow of blood and oxygen to the heart.[9] Thus, the cholesterol attached to LDLs ("LDL-cholesterol") is known popularly as bad cholesterol. In contrast, high density lipoproteins ("HDLs") remove cholesterol from the blood, transporting it to the liver for excretion, a process known as reverse cholesterol transport ("RCT").[10] Thus, the cholesterol attached to HDLs ("HDL-cholesterol") is known popularly as good cholesterol.

High HDL-cholesterol levels correlate generally with low cardiovascular risk,[11] a fact attributed to HDL's role in RCT.[12] Pfizer developed torcetrapib to raise HDL-cholesterol. It anticipated that torcetrapib would accomplish this by inhibiting the cholesterol ester transfer protein ("CETP"), which transfers cholesterol between HDLs and LDLs. This was intended to raise HDL-

---

[8]

Id. ¶ 57 n.4. An anti-atherogenic compound curbs the accumulation of plaque while a pro-atherogenic promotes accumulation. Id.

[9]

Id. ¶¶ 54-56.

[10]

Id. ¶ 59.

[11]

Id. ¶¶ 2 n.2; 58-59.

[12]

Id. ¶ 59.

cholesterol levels by causing cholesterol to accumulate on HDL particles. Ultimately, Pfizer hoped artificially raising HDL-cholesterol would increase RCT and correlate with low cardiovascular risk.[13]

Phase II clinical tests of torcetrapib were designed to determine whether torcetrapib raised HDL-cholesterol levels.[14] Those trials showed that torcetrapib was effective at raising HDL-cholesterol, but they showed also a 2-3 mm increase in systolic blood pressure.[15]

By 2004, Pfizer began Phase III of the clinical trials. As the clinical trials progressed, Pfizer updated the medical and financial communities on torcetrapib's development through public statements and press releases.

On December 2, 2006, Pfizer announced that it was "stopping all torcetrapib clinical trials" based on the recommendation of the Data Safety Monitoring Board ("DSMB") that monitored the trials. The recommendation was made "because of an imbalance of mortality and cardiovascular events."[16] Following this announcement, shares of Pfizer common stock declined by $2.96 per share, from a closing price of $27.86 per share on December 1, 2006, to a closing price of $24.90 per share on December 4, 2006.[17]

Plaintiffs allege that defendants, in the period prior to the cessation of Phase III trials, intentionally or recklessly made statements that were misleading because they failed to disclose facts

---

[13]    *Id.*

[14]    *Id.* ¶ 162(d).

[15]    *Id.* ¶ 9.

[16]    *Id.* ¶ 151, Seidel Decl. (DI 15) Ex. 39.

[17]    Cpt. ¶ 153.

that lessened the likelihood that torcetrapib ultimately would prove safe and efficacious. The misleading statements, plaintiffs claim, were "designed to artificially inflate the price of Pfizer securities" and were part of a "desperate effort to avert significant market loss due to the impending loss of patent protection by principal Pfizer drugs . . . ."[18] Plaintiffs allege that defendant McKinnell was motivated to maximize his severance package, but do not allege that any Individual Defendant sold stock during the class period.[19]

## *Discussion*

### I.    *Standard Governing Motions to Dismiss*

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiffs' favor.[20] In order to survive such a motion, however, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[21]

Although this motion is addressed to the face of the pleadings, the Court may consider also the full text of "documents incorporated into the complaint by reference, and matters of which

---

[18]     *Id.* ¶ 1-3.

[19]     *Id.* ¶ 28.

[20]     *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

[21]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)); *see also Iqbal v. Hasty*, 490 F.3d 143, 158-59 (2d Cir. 2007) (declining to limit *Bell Atl.* holding to the antitrust context).

a court may take judicial notice."[22]  Defendants have submitted many exhibits in support of their

motion, including Pfizer press releases and analyst call transcripts, academic literature, and analyst

reports.  The parties agreed that all of these documents could be considered on this motion to

dismiss,[23] and the Court considers those documents that the complaint incorporates by reference or

are amenable to judicial notice.

      As this is a securities fraud case, the complaint must satisfy the heightened pleading

requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[24]  It must

state the circumstances constituting fraud with particularity.  In particular, it "must: (1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

when the statements were made, and (4) explain why the statements were fraudulent."[25]  Where an

allegation regarding a misstatement or omission is made on information and belief, "the complaint

shall state with particularity all facts on which that belief is formed."[26]  Finally, the complaint must

---

[22]
    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___ U.S. ___, 127 S.Ct. 2499, 2509 (2007) (citing 5B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357 (3d ed. 2004 and Supp. 2007); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

[23]
    The parties agreed that defendants' exhibits could be considered on the motion to dismiss without converting the motion into a motion for summary judgment. Tr., Nov. 7, 2007, at 20:13-23; *see* FED. R. CIV. P. 12(b), (c); *Gurary v. Winehouse*, 190 F.3d 37, 42 (2d Cir. 1999).

[24]
    Pub. L. No. 104-67, 109 Stat. 737 (1995).

[25]
    *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.) *cert. denied*, 531 U.S. 1012 (2000); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir.), *cert. denied*, 534 U.S. 1071 (2001).

[26]
    15 U.S.C. § 78u-4(b)(1).  The requirement of stating "all facts" is not applied literally.  *See Novak*, 216 F.3d at 313-14.

"state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[27]

## II. Plaintiffs' Section 10(b) Claims

### A. Elements of a 10(b) Claim

Section 10(b) makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Rule 10b-5 in turn provides:

> "It shall be unlawful for any person . . .
>
> "(a)    To employ any device, scheme, or artifice to defraud,
>
> "(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security."[28]

---

[27] 15 U.S.C. § 78u-4(b)(2). The required state of mind is "an intent to deceive, manipulate, or defraud." *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (internal quotation marks omitted)); *accord Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

[28] 17 C.F.R. § 240.10b-5 (2007).

To state a claim based on a misrepresentation or omission in violation of Rule 10b-5, as plaintiffs purport to do here, one must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[29]

### B.  *Allegations that Statements were Materially Misleading*

Defendants argue that plaintiffs have not pleaded with particularity facts sufficient to support the belief that defendants' statements were materially misleading.  Plaintiffs, however, contend that they have alleged sufficiently that defendants' statements misrepresented (1) torcetrapib's potential for reducing artherosclerosis, and (2) the seriousness of its side effects.

Plaintiffs must do more than allege that statements were materially misleading: "they must demonstrate with specificity why and how that is so."[30]  Where, as here, factual allegations are made on information and belief, the complaint must allege adequate bases for the allegations.[31]  It "must identify sufficiently the sources upon which [plaintiffs'] beliefs are based and those sources

---

[29]

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998) (internal quotation marks omitted)), *cert. denied,* 546 U.S. 934 (2005); *accord Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

[30]

*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 591 (S.D.N.Y. 2007).

[31]

*See Novak*, 216 F.3d at 306 (quoting 15 U.S.C. § 78u-4(b)(1)); *see also In re IAC/InterActiveCorp*, 478 F.Supp.2d at 591.

must have been likely to have known the relevant facts."[32]  Second, the factual allegations that are based on adequate sources must justify plaintiffs' conclusion that defendants' statements about torcetrapib's were materially misleading.[33]  An omission is materially misleading if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[34]

### 1.  Torcetrapib's Efficacy

Plaintiffs allege, on information and belief, that defendants' statements were misleading because they cast the likelihood that torcetrapib would prove to be effective in a positive light when in fact this was unlikely.[35]  They rest this allegation on four subsidiary assertions:  (1) a study showed that "RCT was not increased by torcetrapib,"[36] (2) another study "demonstrated only that the patients who took torcetrapib were no worse off than those who did not in terms of

---

[32]

    *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F.Supp.2d 385, 395 (S.D.N.Y. 2005).

[33]

    *In re NTL, Inc. Sec. Litig.*, 347 F.Supp.2d 15, 23 (S.D.N.Y. 2004); *Fraternity Fund Ltd.*, 376 F.Supp.2d at 395.

[34]

    *Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted and internal quotation marks omitted)).

[35]

    *See* Cpt. ¶ 1, 6 (describing how omission made statements misleading); Pl. Mem. at 2 (same); *id.* at 11-12 (asserting materiality of omissions).

[36]

    See Cpt. ¶¶ 116; 124, 135; 141; 149; 100; 113 (alleging that statements are misleading for this reason); *id.* ¶¶ 109; 111; 118; 122 (alleging that statements are misleading because "Phase II trials did not find any correlation between CETP inhibition and increased RCT").

cholesterol removal . . . ,"[37] (3) "there was conflicting evidence on whether CETP inhibition [the mechanism by which torcetrapib raised HDL] was pro- or anti-atherogenic,"[38] and (4) "Pfizer had been warned internally that CETP inhibition would not work."[39] None, however, withstands analysis.

### (a) Do the Cited Sources Support Plaintiffs' Subsidiary Allegations?

The allegation that RCT was not increased by torcetrapib is said to be based on the Brousseau study.[40] Contrary to plaintiffs' allegation, however, Brousseau did not reach any conclusion about whether torcetrapib increased RCT.[41] In fact, the study observed only that torcetrapib did not affect fecal concentrations of neutral sterols and bile acids, which it used to assess RCT indirectly. But it noted also that these surrogates might not be affected by an increase in RCT if torcetrapib were associated with "a decrease in hepatic cholesterol synthesis and a proportional

---

[37] *See id.* ¶ 113; 124; 12 (alleging that statements are misleading for this reason).

[38] *See id.* ¶¶ 103; 116; 135; 141; 149 (alleging that statements are misleading for this reason); *Id.* ¶¶ 107; 120; 137 (alleging that statements are misleading because CETP inhibition "was equally likely to be linked to adverse coronary risks"); *Id.* ¶¶ 129; 131 (alleging that statements are misleading because studies suggested that CETP inhibition "could well increase coronary heart disease.").

[39] *See id.* ¶¶ 103; 116; 135; 141; 149 (alleging that statements are misleading for this reason).

[40] *See id.* ¶ 100-01 (citing the Brousseau study); ¶¶ 111; 113; 116; 118; 122; 124, 135; 141; 149; 109 (citing no source or paragraphs 100-01).

[41] Seidel Decl. Ex. 12, at 1062.

increase in cholesterol synthesis in the peripheral tissues."[42]  The complaint's reliance on Brousseau therefore is misplaced.

The claim that another study showed only that patients on torcetrapib were no worse off in terms of cholesterol removal than others rests on the Bamberger study abstract.[43]  Plaintiffs suggest that Bamberger observed no affirmative evidence of cholesterol removal.  In fact, however, the abstract reported statistically significant increases in the two measures of cholesterol removal that were observed and concluded that "partial inhibition of CETP with T[orcetrapib] does not compromise, *and may enhance*, the cholesterol efflux potential of HDL, which is considered the first step in reverse cholesterol transport."[44]  Thus, plaintiffs' characterization of Bamberger, like their characterization of Brousseau, is misleading.

Plaintiffs' third allegation is based on scientific articles published between 1993 and 2006.[45]  These sources support plaintiffs' allegation "that there was conflicting evidence" about torcetrapib's potential efficacy.

---

[42]

*Id.*

[43]

*See* Cpt. ¶¶ 113, 124, 12 (quoting from the abstract to the Bamberger study).  Based on the facts alleged in the complaint, defendants identify plaintiffs' source as the Bamberger study, which was presented by Pfizer at the November 2005 Conference of the American Heart Association.  *See* Seidel Decl. ¶ 14; Def. Mem. at 9, 23.  Plaintiffs do not contest that this was their source.

[44]

Seidel Decl. Ex. 13 (emphasis added).

[45]

*See* Cpt. ¶¶ 63-76 (summarizing studies from 1996 to 2006 that found CETP deficiency due to a genetic mutation was correlated with an increased risk of CHD); ¶¶ 103, 116; 135; 141; 149 (citing to paragraphs 63-76); ¶¶ 107, 120; 137 (citing to no source); ¶¶ 129; 131 (citing to paragraphs 12; 44; 54-87, but only paragraphs 63-76 support fact alleged).

Plaintiffs' final and most significant allegation – viz. that Pfizer had been warned internally that CETP inhibition would not work – is based entirely on an anonymous blog post.[46] Plaintiffs have identified their source – the text of the blog post – and included its full text in their complaint. But this is not sufficient.

In addition to identifying the source, the source must be shown to have been likely to know the relevant facts.[47] There is no reason to believe that the author of this blog, identified only as RADmanZulu, is likely to have known the relevant facts.

Plaintiffs try to avoid this inevitable conclusion by attributing characteristics to the blog's anonymous author. They assert that RADmanZulu is "a former Pfizer Vice-President and Medical Therapeutic Head of Pfizer's Cardiovascular & Metabolic Group, who also acted as medical director of Pfizer's Cardiovascular Risk Factors Group in the [United States] . . . [through the second half of 2002]."[48] But the blog post, plaintiffs' purported source, does not contain any information about RADmanZulu's identity, and plaintiffs do not articulate any other basis for their belief.[49]

---

[46]

See id. ¶¶ 44 (reprinting the text of the blog post); ¶¶ 103; 116; 135; 141; 149 (citing to paragraph 44; 100-02).

[47]

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F.Supp.2d 385, 395 (S.D.N.Y. 2005); In re NTL, Inc. Sec. Litig., 347 F.Supp.2d 15, 23 (S.D.N.Y. 2004).

[48]

Cpt. ¶ 43. The complaint alleges that RADmanZulu held these positions "during the relevant period," but at oral argument, plaintiffs specified that he was employed at Pfizer through the 'second half of 2002.' Tr., Nov. 7, 2007, at 21:15-17.

[49]

At oral argument, plaintiffs explained that they alleged RADmanZulu's identity based on "an investigation." Tr., Nov. 7, 2007, at 21:5-10. Plaintiffs did not elaborate on this investigation, and they do not claim to have spoken to the man they assume to be the author of the blog. Id.

Even if we credited plaintiffs' assertion that RADmanZulu was employed at Pfizer through the end of 2002, the question of whether he would have been likely to know the relevant facts would remain. In the blog post, RADmanZulu claims that, "[e]arly in the program, people like Brian Brewer and Michael Brown warned Pfizer that blocking CETP was likely to accelerate atherosclerosis."[50] To support the inference that RADmanZulu would have been likely to know the relevant facts, plaintiffs rely entirely on his alleged positions at Pfizer.[51] But the complaint does not describe RADmanZulu's role at Pfizer or his participation in relevant events. Moreover, RADmanZulu's allegation does not claim to be based on personal knowledge and lacks detail that might suggest personal knowledge. For example, the blog post does not describe when,[52] how, on what basis, by whom, or to whom the alleged warning was communicated. Even setting aside the numerous deficiencies with this source, RADmanZulu's assertion that someone warned Pfizer that CETP inhibition was likely to accelerate atherosclerosis does not support plaintiffs' larger claim that Pfizer was warned it would not work.

---

[50]

    Cpt. ¶ 44.

[51]

    *See, e.g.*, Pl. Mem. at 10 ("Needless to say, [RADmanZulu's] position . . . makes him eminently qualified to know about adverse effects of Pfizer principal cardiovascular drug and the status of clinical trials.").

[52]

    Although according to plaintiffs' own assertions, RADmanZulu left Pfizer during second half of 2002, and would have no basis for knowledge after that time.

>           (b)      *Does the Sufficiently Sourced Subsidiary Allegation Justify Plaintiffs'*
>                    *Inference?*

The next question is whether the facts alleged, to the extent they are based on adequate sources, support plaintiffs' inference that torcetrapib was unlikely to reduce artherosclerosis and thus made defendants' positive statements materially misleading.

Only one of plaintiffs' subsidiary allegations is supported by adequate sources – viz. that there was conflicting evidence on whether CETP inhibition was pro- or anti-atherogenic. Drawing all inferences in plaintiffs' favor, the most this allegation supports is an inference that evidence available during the class period was inconclusive on torcetrapib's potential efficacy.

Defendants' knowledge that evidence of torcetrapib's efficacy was inconclusive does not support an inference that their optimistic statements were materially misleading. Defendants were entitled to take an optimistic view of inconclusive evidence, so long as they did not make positive statements while withholding negative information that would have been material to an investor.[53] "[C]orporate officials need not present an overly gloomy or cautious picture" so long as "public statements are consistent with reasonably available data."[54]

This principle is applicable in the drug development context. In the *Carter-Wallace* cases, "the Second Circuit concluded that the drug manufacturer's assurances about safety 'did not become materially misleading until [it] had information that [the drug] had caused a statistically

---

[53]    *See, e.g.*, *In re IAC/InterActive Corp., Sec. Litig.*, 478 F.Supp.2d 574, 591 (S.D.N.Y. 2007) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).

[54]    *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 2000); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).

significant number of . . . deaths and therefore had reason to believe that the commercial viability of [the drug] was threatened.'"[55]

To be sure, *Carter-Wallace* did not adopt a bright-line rule that a statement is materially misleading only if it conflicts with statistically significant evidence.[56] Thus, if a drug manufacturer in fact draws a pessimistic conclusion from statistically insignificant evidence, any optimistic statements it makes could be rendered materially misleading if it were to omit even statistically insignificant negative evidence.[57] But plaintiffs' allegations do not support an inference that defendants actually drew a negative conclusion from the inconclusive evidence.[58] They allege only that Pfizer's optimistic statements were misleading because it failed to state also that there was conflicting evidence as to whether CETP inhibition would be pro- or anti-atherogenic. This is insufficient under *Carter-Wallace*.

---

[55]

*In Re Bayer AG Sec. Litig.*, 03 Civ. 2004 (WHP), 2004 WL 2190357, at *8 (S.D.N.Y. Sept. 30, 2004) (quoting *In re Carter-Wallace Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998)

[56]

*See, e.g.*, *In Re Bayer AG*, 2004 WL 2190357, at *9; *In re Corning, Inc. Sec. Litig.*, Nos. 92 Civ. 345 (TPG), 92 Civ. 1103 (TPG), 2001 WL 986782, at *2 (S.D.N.Y. Aug. 27, 2001).

[57]

*See, e.g., In Re Bayer AG*, 2004 WL 2190357, at *9-10.

[58]

Plaintiffs argue otherwise in their memorandum: "Defendants had actual knowledge that . . . CETP-inhibition would increase atherosclerosis and that torcetrapib did not increase the rate of RCT." Pl. Mem. at 15-16. But this assertion is not supported by the adequately sourced subsidiary allegation of the complaint and falls short of the circumstances in *In re Regeneron*, on which plaintiffs rely. In that case, the court observed that "[t]he key allegation is that the Defendants knew of the existence of the . . . problem, rather than being aware of the possibility of the problem." *In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005). Here, the most plaintiffs have alleged, even if one were to consider RADmanZulu's assertions, is that defendants were aware of the possibility of a problem.

Furthermore, while plaintiffs assert that the allegedly omitted facts relating to torcetrapib's efficacy were material, allegations in the complaint belie that claim.[59] An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[60] In this case, it is clear that the conflicting evidence of torcetrapib's efficacy was part of the total mix of information available to the market.[61]

Plaintiffs argue that there is a factual question about whether investors "read and digested" the available information.[62] But the relevant inquiry is not whether the truth was absorbed by the market, but whether it was available to the market.[63] Moreover, the complaint here alleges that the market absorbed all available information.[64] This allegation allows plaintiffs to avoid a fact intensive question of whether the market actually was aware of defendants' alleged misstatements. But it simplifies also the question of whether the market was aware of the allegedly omitted facts.

---

[59]

Pl. Mem. at 12 (asserting materiality).

[60]

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

[61]

The Court is aware that whether an allegedly omitted fact was available to the market often is a fact intensive inquiry that is "rarely an appropriate basis for dismissing." *Id.* at 167. "However, 'rarely appropriate' is not the same as 'never appropriate,' and '[m]ateriality is a mixed question of law and fact.'" *White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004).

[62]

Pl. Mem. at 30 n.27.

[63]

*Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) ("the relevant question is not whether the market 'truly knew' any specific piece of information, but whether the information was 'reasonably available.'").

[64]

Cpt. ¶ 167.

It is evident that the allegedly omitted information was available to the market because plaintiffs, in their effort to identify allegedly omitted information, rely entirely on sources that were available publicly during the class period.[65]   Indeed, analysts' reports acknowledged the conflicting evidence of torcetrapib's efficacy.[66]   According to plaintiffs, such reports were "publicly available and entered the public marketplace."[67]

Finally, plaintiffs argue that the sudden drop in stock price after the "revelation of previously undisclosed information" prevents a conclusion that the allegedly omitted information was absorbed by the market.  This is not persuasive.  The drop in stock price did not follow the revelation of the allegedly omitted fact – that there was conflicting evidence about torcetrapib's efficacy.  Rather, as plaintiffs explain elsewhere in the complaint, it followed the "sudden news . . . that the clinical trials were being halted," a development that was significant independent of whether there previously had been conflicting evidence of torcetrapib's efficacy.[68]

---

[65]   The sole exception is that the RADmanZulu blog post was not available to the market during the class period.

[66]   *See, e.g.*, Seidel Decl. Exs. 14, 15, 24, 30; *see also* Seidel Decl. Exs. 5, at 22; 28.

[67]   Cpt. ¶ 166(d).

[68]   *Id.* ¶ 17.

## 2. Blood Pressure Side Effect

Plaintiffs allege, on information and belief,[69] that defendants' optimistic statements about torcetrapib's side effects were misleading because its side effects were unmanageable.[70] This assertion rests on subsidiary assertions that: (1) even small increases in systolic blood pressure may be dangerous,[71] and (2) "Pfizer believed, but did not disclose, that the metabolite(s) of torcetrapib could inhibit [monoamine oxidase], thereby causing increased blood pressure . . . ."[72]

### (a) Do the Cited Sources Support Plaintiffs' Subsidiary Allegations?

Plaintiffs' first allegation is based on scientific research and statements made by Pfizer in other contexts.[73] These sources support plaintiffs' factual allegation that even small

---

[69]

Cpt. Preamble.

[70]

*Id.* ¶ 6; *see also id.* ¶ 1 (defendants misrepresented "that blood pressure side effects found in the clinical trials . . . were of little concern"); Pl. Mem. at 2 (defendants "falsely minimized the significance of increased blood pressure").

[71]

*See* Cpt. ¶¶ 103; 105; 116; 127; 137; 141; 149 (emphasis added) (alleging that statements are misleading for this reason). The complaint alleges also that defendants failed to disclose that torcetrapib raised blood pressure and that Phase II studies had outliers who experienced larger increases in blood pressure. Plaintiffs make clear, however, that they do not allege a failure to disclose these facts. Pl. Mem. at 3 n.2; Tr., Nov. 7, 2007, at 26:19-22. Thus the key to plaintiffs' allegations is that defendants omitted that the blood pressure increase was "dangerous" and "threatened the efficacy and approval of [torcetrapib]." *See, e.g.*, Cpt. ¶¶ 103, 127.

[72]

*See* Cpt. ¶¶ 103, 105; 111; 116; 118; 122; 127; 133; 141; 145; 149 (alleging that statements are misleading for this reason).

[73]

*See id.* ¶¶ 77-87 (citing studies and Pfizer statements made in other contexts); ¶¶ 103; 105; 116; 127; 137; 141; 149; 9; 162 (citing to paragraphs 77-87).

increases in blood pressure may be dangerous. However, this does not lead inevitably to the inference that the side effect was unmanageable or unjustifiable.

Plaintiffs' second allegation is based on the same RADmanZulu blog post discussed above.[74] RADmanZulu asserted that "[t]he current wisdom of the time is that one of the metabolites inhibited mono amine oxidase."[75] Even if we assume, as plaintiffs do, that RADmanZulu was employed at Pfizer through the second half of 2002, this source would be insufficient to support plaintiffs' allegation that "Pfizer believed" that torcetrapib could inhibit monoamine oxidase. RADmanZulu's assertion is vague: it does not claim a basis for personal knowledge, nor does it explain when, by whom, or on what basis the "current wisdom of the time" was held.

> (b)    *Does the Sufficiently Sourced Subsidiary Allegation Justify Plaintiffs' Inference?*

Drawing all inferences in plaintiffs' favor, the plaintiffs' factual allegations and sources support an inference that small increases in blood pressure can be dangerous. But plaintiffs' sources and factual allegations do not support the inference that torcetrapib's side effects were unmanageable. Nor do the sources or factual allegations support an inference that defendants actually believed the side effect was unmanageable. Indeed, plaintiffs' own source, the blog post, undermines any inference that Pfizer believed the blood pressure side effect was unmanageable.

---

[74]    *See id.* ¶ 44 (reprinting weblog post of RADmanZulu); ¶¶ 85; 103; 105; 111; 116; 118; 122; 127; 133; 141; 145; 149 (citing to paragraph 44).

[75]    *Id.* ¶ 44.

According to RADmanZulu: "The Groton team felt that [blood pressure] could be managed by lowering the dose and hoped that atorvastatin would also lower [blood pressure]."[76]

Finally, torcetrapib's ultimate failure is not evidence that the side effects were thought to be unmanageable at the time the alleged misstatements were made. Fraud-by-hindsight is not sufficient to establish liability under Rule 10b-5.[77] In any case, plaintiffs have not alleged that torcetrapib failed because its side effects were unmanageable.[78] They acknowledge that the most they can allege is that torcetrapib failed because "there was a difference in deaths between the group which got the drug and the group that didn't."[79]

*   *   *

Plaintiffs have not pleaded with particularity facts sufficient to support their allegation that defendants' statements were materially misleading. Many of plaintiffs' factual allegations are not based on an adequate source or are unsupported by the purported source. Those allegations that are based on adequate sources do not support the inference that defendants' statements about torcetrapib's safety or efficacy were materially misleading. For the foregoing reasons, the complaint

---

[76]

*Id.*

[77]

*See In Re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 412 (2d Cir. 2000) ("the eventual linking of [a side effect] to [a drug] cannot relate back to the time of the statements . . . and reflect on [defendant's] reasonable belief").

[78]

Tr., Nov. 7, 2007, at 32:13-14.

[79]

*Id.* at 27:4-7.

fails to state the circumstances constituting fraud with particularity as required by Rule 9(b) and the PSLRA.

### C.    Scienter

Even if the complaint had pleaded adequately the circumstances constituting fraud, it would be insufficient nonetheless.  Plaintiffs must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind."[80]  A complaint may satisfy this requirement "by alleging facts (1) showing that defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior."[81]  A complaint gives rise to a strong inference of *scienter* "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[82]

### 1.    *Motive and Opportunity*

To plead motive, plaintiffs must allege facts demonstrating "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[83]

---

[80]    15 U.S.C. § 78u-4(b)(2).

[81]    *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).

[82]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___U.S. ___, 127 S.Ct. 2499, 2510 (2007).

[83]    *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *see also Ganino*, 228 F.3d at 170; *Novak v. Kasaks*, 216 F.3d 300, 307 (2d. Cir. 2000).

It is not sufficient to allege motives that are "generally possessed by most corporate directors and officers."[84]  And "[g]eneral allegations that the defendants acted in their economic self-interest" are insufficient.[85]

Plaintiffs attempt to plead motive by alleging that Pfizer had a "desperate need . . . to assure the financial community of the existence of a new blockbuster drug."[86]  This is not a unique motive.  Rather, it is a way of saying, in a manner tailored to a pharmaceutical company, something that is true for all profit enterprises – each has an incentive to portray the likelihood that it will continue to prosper.

Courts in this district have found similar allegations of motive insufficient.  For example, plaintiffs in *In re Bayer* sought to plead motive by alleging that "[Bayer] was under pressure to bring a 'blockbuster drug to market.'"[87]  And in *In re Bristol-Myers Squibb*, the plaintiffs alleged motive based on the defendants' desire to "'maintain a facade of future potential' for [its] drug pipeline, . . . [and to] address potential concerns about patent expirations . . . ."[88]  Both courts

---

[84]

*Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

[85]

*Ganino*, 228 F.3d at 170.

[86]

Pl. Mem. at 21.

[87]

*In Re Bayer AG Sec. Litig.*, 03 Civ. 2004 (WHP), 2004 WL 2190357, at *14 (S.D.N.Y. Sept. 30, 2004).

[88]

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 560-61 (S.D.N.Y. 2004).

found these allegations insufficient. The latter court described such allegations as "nothing more than a pejorative characterization of . . . ordinary corporate desires."[89]

Plaintiffs argue that McKinnell had motive to commit fraud in order to increase his severance package.[90] Performance based compensation plans "are typical of nearly every corporation" and are usually insufficient to plead motive.[91] "If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."[92] Plaintiffs' attempt to distinguish McKinnell's severance agreement from generic performance-based compensation plans is disingenuous.[93]

### 2. *Conscious Misbehavior or Recklessness*

To raise a strong inference of *scienter* based on recklessness, plaintiffs must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards

---

[89]

*Id.* at 561.

[90]

Pl. Mem. at 22; Pl. Reply at 4. Plaintiffs do not allege motive for the other individual defendants.

[91]

*In re Bristol-Myers Squibb*, 312 F.Supp. 2d at 561.

[92]

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

[93]

Pl. Mem. at 22-23. Plaintiffs argue that McKinnell had a motive to commit fraud because he was awarded a severance package "which was dependent, in part, upon 'Pfizer's actual [stock] performance relative to the pharmaceutical peer group.'" Cpt. ¶ 28. But this portion of McKinnell's severance package reflects "McKinnell's outstanding performance-contingent share and performance share awards . . . settled in accordance with the original terms and conditions of such awards." Pfizer's Dec. 21, 2006 Form 8-K.

of ordinary care."[94]  If a complaint fails adequately to allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness 'must be correspondingly greater.'"[95]  "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts . . . ."[96]

Plaintiffs attempt create a strong inference of *scienter* by alleging that: (1) defendants had knowledge or access to information contradicting their public statements,[97] (2) "Pfizer intentionally established endpoints for the Phase II trial of increased HDL-[cholesterol] in order to ensure that the endpoints would be obtained, knowing full well that such endpoints . . . potentially were associated with increased coronary heart risk,"[98] (3) "Pfizer intentionally violated AHA [American Heart Association] Rules in order to pre-announce its Phase III clinical results in order to 'spin' the adverse blood pressure side effect results found therein,"[99] and (4) "Pfizer knowingly

---

[94]  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (internal quotation omitted).

[95]  *In Re Bayer AG Sec. Litig.* 03 Civ. 2004 (WHP), 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)); *see also Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___ U.S. ___, 127 S.Ct. 2499, 2511 (2007).

[96]  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

[97]  Cpt. ¶ 162(a)-(c).

[98]  *Id.* ¶ 162(d).

[99]  *Id.* ¶ 162(e).

designed the torcetrapib Phase III trials to allow the trial to continue until an unreasonably high statistical certainty was met."[100]

Plaintiffs rely on the same factual allegations and sources to assert defendants' knowledge of or access to information contradicting their public statements. As addressed above, plaintiffs' factual allegations and sources do not support the inference that defendants' statements were materially misleading. "If the facts alleged in the Complaint are insufficient to support Plaintiffs' belief that false or misleading statements were made, those facts cannot support an inference that Defendants knew or should have known their statements were false or misleading when Defendants made them."[101]

Even if plaintiffs' factual allegations about torcetrapib's efficacy and safety could be understood as contradicting defendants' statements, the contradictory information was publicly available.[102] Numerous courts have suggested or assumed that the contradictory information must have been non-public in order to raise a strong inference of intent.[103] That the information was publicly available when the allegedly misleading statements were made weakens any inference that defendants intended to defraud the market.

---

[100]

*Id.* ¶ 162(f).

[101]

*Feasby v. Industri-Matematik Intern. Corp.*, 99 Civ. 8761 (LTS), 2003 WL 22976327, at *5 (S.D.N.Y. Dec. 19, 2003) (quoting *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir.1996).

[102]

With the exception of the allegations supported by RADmanZulu's blog.

[103]

*In re GeoPharma, Inc. Sec. Litig.*, 399 F.Supp.2d 432, 452-53 (S.D.N.Y. 2005); *accord Higgenbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758-59 (7th Cir. 2007).

Plaintiffs' remaining allegations are conclusory statements of defendants' intent. The complaint makes no factual allegations that suggest that Pfizer violated AHA rules in order to spin the results, or that Pfizer designed Phase II studies to avoid uncovering adverse clinical results, or that Pfizer used an unreasonably high measure of statistical significance to postpone termination of Phase III.[104] Conclusory allegations of intent are not sufficient.[105] Plaintiffs cannot circumvent this requirement by providing subsidiary allegations that merely are conclusory allegations of intent.

III.    *Plaintiffs' Section 20(a) Claims*

Plaintiffs assert also claims under Section 20(a) of the Exchange Act[106] against the individual defendants. Section 20(a) claims are necessarily predicated on a primary violation of securities law and impose 'control person' liability on individual defendants.[107] Because plaintiffs have failed to state a claim for a primary violation of Section 10(b) of the Exchange Act, their Section 20(a) claim must be dismissed against all defendants.

---

[104]

Plaintiffs' source suggests that Phase III used an appropriate measure of statistical significance. *See* Seidel Decl. Ex. 42, at 1144 (cited in Cpt. ¶ 91)).

[105]

*Rombach v. Chang*, 355 F.3d 164, 176-77 (2d Cir. 2004) (a "pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent" is insufficient to "support the inference that the defendants acted recklessly or with fraudulent intent.") (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

[106]

15 U.S.C. § 78t(a).

[107]

*Rombach*, 355 F.3d at 177-78.

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss the amended complaint [docket item 13] is granted. Plaintiffs' request for leave to amend[108] is denied without prejudice to a motion for leave to amend supported by a proposed amended complaint.

SO ORDERED.

Dated:          February 28, 2008

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[108]      Plaintiffs requested leave to amend in a footnote of their memorandum. Pl. Mem. at 35 n.36.